May it please the Court, under basic canons of construction, the Department of Commerce must interpret scope language as a whole and in context, not by isolating or distorting individual terms. This interpretive rule is well established by this Court, including Meridian Products and Arcelo Middle. Yet, that is exactly what happened here. Commerce parsed a defined phrase, three-series alloy as designated by the Aluminum Association. Commerce severed the term designated from the surrounding language and interpreted it outside the industry context. These terms, three-series alloy, designated, the Aluminum Association, these are all industry-specific terms and cannot be interpreted outside the aluminum context. In Arcelo Middle, the Court said, when interpreting the plain meaning of the scope language Are you saying that designated is equivalent to registered? That is correct, Your Honor. Well, if they admit registered, why wouldn't they have used the word registered? Because that's the way that word is used in the aluminum industry. What about the teal sheets themselves? They repeatedly say, you know, in order to register, you need to first designate and things like that. They use the words registration and designation, so why doesn't that indicate that they mean something different? The teal sheets also use the word designated and designating to refer to the act of assigning a number to an unregistered alloy. Right. I think that they use, it's similar to Judge Hughes' question, where it refers to designating something before you register it. And so therefore, it uses those words meaning two different things. So why isn't, you know, again, going back to the question of if designate means register, you know, why wouldn't the teal sheets use the same language instead of having to use the same words? I think they'll use the same language instead of using two different words. I believe the teal sheets use the word register when it tries to explain what designation means or what the word, the term designate means. So it's providing its own explanation of the term designate. You might want to, at some point, point out where that's happening, because I'm not reading that document the same way you are. Sure you are. The phrase 3-series as designated by the Aluminum Association... Let's just assume we disagree with you, that this is unambiguously in your favor, and that when the scope order here is ambiguous on its face. Then why isn't Commerce right in its K-1 and K-2 analysis? Would you please repeat that? You lose on plain language. Do you lose then because Commerce's determinations under K-1 and K-2 are legally correct and supported by substantial evidence? We believe that we still win on the substantial evidence standard as well. And I can continue on to make those arguments. Well, that's the question I just asked you. Based on the substantial... First of all, assuming that we lose on the plain meaning argument, then the next step would be the K-1 analysis. And our argument is that Commerce used an impermissible K-1 source, which is its separate rate determination, because it doesn't contain any description of the merchandise which is required under Commerce's own regulation. I mean, the determination itself is a permissible K-1 source, right? Our position is that it is not, because... No, no, no, no. If we're just looking at the determination, that's a permissible K-1 source. I think your position is, and correct me if I'm wrong, that Commerce didn't just look at the determination itself, which is on the record, but the underlying application, and that that's not a K-1 source. Our position is actually not that. Our position is that the determination itself is not a K-1 source. It has to be... What's your basis for that? It's the wording in the regulation. Don't talk over me. It's a determination of Commerce. That's a K-1 source. Why isn't it a proper K-1 source? Because the terms of the regulation says that descriptions of merchandise contained in Commerce's determination, that's the full phrase used in Commerce's regulation. And we believe that phrase is crystal clear, and there's no ambiguity in the regulation. You don't think that separate rate determination describes the goods that are going to get the separate rate? It does not. How does it give it a separate rate, then? The separate rate determination consists of six pages in the preliminary determination. And in those six pages, Commerce discusses why some companies are entitled to separate rates, because they are free from government control over their export activities. They do not discuss the merchandise that they export. The only phrase used in the separate rate determination is the phrase subject merchandise. And that's the question at issue here. What is the subject merchandise? But that's the only word used in the separate rate determination, the subject merchandise. Which is referenced in the applications? We believe that Commerce cannot incorporate an external document into their determination. There are a number of due diligence issues. For example, parties never had any comment to make comment on the particular issue, because it's information that is not expressly incorporated into the determination itself. I mean, it's the basis for the entire application. That is also true. And the alternative position is that even if you could incorporate the separate rate application, the application itself does not include any description of their merchandise. The only so-called description is their alphanumerical code, their commercial product code, which tells nothing. And in fact, two years after the separate rate determination, Commerce has issued a questionnaire in which they asked, what is this product code? What does it mean? So even in the application there's no description of the merchandise. And the product code in the numeral XXX form, was the product code in this like three triple X form? It was not, actually. It was similar. But based on the fact that it's similar, we believe that that's only a mere speculation and that's demonstrated by the record itself because two years later, Commerce came back and said, what is this? What does it mean? So Commerce can argue that two years before asking that question they had an idea of what the product was. Can I ask you just a housekeeping question? I don't know if it's housekeeping, but just more background. What is the purpose of this registration system in your view? So this registration system, the purpose, it's an industry standard, right? So the American Aluminum Association wants to know what alloys are out there and they want parties to use their designations as the standard name for their alloys. So if I'm making a particular product, say an automobile, I can know what I'm getting? Exactly, Your Honor. Thank you. And one thing that I wanted to note is that the Aluminum Association designations do not have any residual categories. Why do you think that Commerce would have limited the scope order to only registered articles rather than stuff that is being dumped on the American market even if it's not registered? I think Commerce could clearly do exactly what they are claiming to have done in the past by simply just naming the prime major alloying element. It's not a very difficult definition. If an alloy contains manganese then it's covered. If an alloy contains magnesium then it's covered. So if this scope thing after the 135 series alloy had the words in the types as designated by the Aluminum Association that would be clearer? That would have been clearer but now here's another point. Commerce's alternative interpretation refers to notes. Sorry, I want to follow up on that. Why do we need that language? Because your view is that it's altering the definition of designation so it would still be in the types as registered. I'm just curious. You didn't really answer the question. Why do you think Commerce ever would limit a scope to certain registered alloys rather than all the types of alloys that would otherwise be within the investigation and dumping order just because somebody had a proprietary blend or had some other thing that didn't get registered? That would seem to allow for distortion in the market and be contrary to what you said was the Aluminum Association's goal of getting people to register their stuff. If we allowed you to not have duties because you weren't registered then nobody would register their alloys. I think that point is consistent with the plain language of the scope which says that common alloy aluminum sheets We believe that it was the Aluminum Association's intent to cover I don't care about the Aluminum Association's intent. I care about Commerce's intent in doing this investigation and the scope of the investigation and determining what to assess duties on. It seems to me almost impossible that Commerce would have thought well, there are going to be these alloys coming in that are covered by our investigation and are being dumped but we're not going to assess duties upon them because they're not registered. It is not uncommon for Commerce to align their scope definition with the intent of the petitioner and in this case what should be Commerce's intent or the petitioner's intent was to cover aluminum alloys that are widely used in the industry and not limit the imports of aluminum alloys that are very required in the US market. Imported aluminum alloys that are very required in the niche uses for those because those would clearly prohibit the proper function of the  All right. So we the legal principle in Can I just say you're just about into your rebuttal time if you want to save the extra ten seconds. May I just make one more point if you ask Regarding Node 2 even if you look at Node 2 of the TLSH which Commerce claims to have been the source, the definitional source of its alternative interpretation, that source actually says that aluminum series contains only registered alloys and the reason is the original text of the Node 2 says the first of the four digits in the designation indicates the aluminum group. This is appendix page 897. Thank you. And you said Node 2. Exactly. I'm sorry, is this That is the TLSH, Your Honor. And that is one page of the TLSH. So your view is that this page of the TLSH supports your position that designations and registration are the same thing. Exactly, and that is the case throughout the TLSH, Your Honor. And not only that, if you look at the note, it says the first of the four digits in the designation indicates the alloy group. And even the government agrees that the word designation is used to refer to registered alloy in the TLSH. So this note says that the four digits, the first of the four digits code for a registered alloy indicates the alloy group. Now compare this to the appellee's language in its response on page 21. The appellee says the first of the four digits in the designation system indicates the alloy group. The government literally took the sentence from Node 2 and inserted the word system in there to suggest as if there's some kind of general series grouping. In fact, the note says the exact opposite. So even on the substantial standards, substantial evidence standard, we do not believe the government's alternative interpretation was reasonable. What about, there's language, for example, on this very same page, up at the top third full paragraph, it says numerical designation assigned in conformance with this recommendation should only be used to indicate an aluminum or aluminum alloy having chemical composition limits identical to those registered. Right? So saying a numerical designation should be identical to something that's registered, using those words mean two different things. In other words, when you're going to register an alloy, you're going to first designate it in which series and then you can register it. Why isn't that the most reasonable understanding of this language? I believe, we believe that particular note says that unless it's, it meets the exact chemical composition limits in the teal sheets, you cannot use the four-digit number to refer to an alloy that is similar. Thank you.  Good morning, Your Honors. May it please the Court. The Court should affirm the judgment of the Court of International Trade because Commerce lawfully conducted a scope inquiry under 19 CFR section 351.225. I'll focus on two points today, addressing arguments that were made this morning. First, Commerce correctly determined that the scope language is ambiguous and second, Commerce correctly relied on and evaluated K1 sources. Can you jump to that? Why was it appropriate to rely on the separate rate determination here if it didn't identify the specifics of the alloy that was at issue? Well, first, it is I think unequivocally a K1 source because it is, I'm just quoting the regulation, a determination of Secretary of Commerce. Okay, I mean, I'm with you on that, but how is it helpful if it, on its face, doesn't tell you they get a separate rate for this, I think it's another proprietary alloy, right? They get a separate rate for this proprietary alloy. If it doesn't add that, why does that tell us anything on the determination itself about what the scope is? Well, Your Honor, they would only get a separate rate determination if the merchandise applicable. Oh, no, I understand it, and the application certainly details that it's not of the designated or the registered bonds, right? But that's in the application, so I guess the first question is, is it sufficient that it's in the application? Because that's not a determination, or do you think that becomes encompassed in part of the determination? I think that's a fair way to describe it, that it becomes encompassed in part of the determination. I think it's relevant here that in light of the missing information in the determination itself, Commerce didn't say that that source is dispositive. Commerce said it weighs in favor of a finding that unregistered alloys can be included within scope, but it went on and conducted a K2 analysis. But the determination itself is, I think that's the distinction you have to draw. I, like you Judge Hughes, understood their argument to be that the K1 source was the application rather than the determination, but the determination is where the interpreted value came from. It wasn't the application. The application without the determination wouldn't have given any indication as to Commerce's intent with respect to the scope language. It was the determination that a separate rate could be assigned that indicated Commerce understood that the merchandise which was unregistered fell within the scope of the orders. I have something I'm confused about, and frankly I'm not sure if it matters, but I'm unclear where the sheet's fault is. Is it something that's incorporated by reference because it's the language and the regulation itself? Is it a K1 source, or is it a K2 source? I was just trying to understand that. Yeah, I think the trade court analyzed it correctly and basically said it doesn't matter. Did they put it in a bucket? I couldn't tell. I think they, in their first opinion, may have said it was incorporated. Or at least that seems to be the way they treated it. I think that's right. I think what they said was that at least with respect to the 3x portion of the orders, that the teal sheets provided the relevant trade usage that could be used even in a K0 analysis. I don't think that they could be considered necessarily a K1 source because, again, we have the designated language that qualifies as K1 sources. But, again, the relevant trade usage can be taken into consideration in conducting a K1 analysis or a K0 analysis. So if, hypothetically, the teal sheets have been really, really clear and stated what we understand your position to be, that designated and registered are different, and that designated just means of the type in these categories, then that could come in at K0 to make this unambiguously in your favor. If it was clear. In theory, that's right. I think that the problem we might run into with that is can the teal sheets sort of monopolize the use of the word designate such that is unequivocally an industry understood. Well, if that's what it says, let's just assume that's what it says. Then, yes, I think that's right. If the teal sheets, and I think the problem here is that they're maybe not that specific. But if they've said, this is exactly, the definition is the same thing the government has in its scope, essentially, then they could come in and be definitional at K0 as trade usage. That's right. I think that this sort of says that. If that's the case, can you then you still look to them at K0, but sometimes they don't answer the question at K0. Correct. And I think in particular here, you look at them at K0 not necessarily for the term designate, I mean, unless, as your honor, unless they were clear as to the use of the term designate. But it's really related to the 3X series core, which indicates that the core has a primary alloying agent of manganese. And so that's sort of what the teal sheets provide us at the K0 analysis. But if they're used at K0, then why would you use them again at K1? That's what confused me a little bit about the trial court's reasoning too. I don't think that, I believe it was just last month in Vandalwater, this court said that you can consider trade usage at your K0 analysis. It's not as fulsome as it would be at K1 or K2. I don't think that the court has to or Commerce has to remove relevant trade usage from its analysis just because it's moving beyond K0. I think it's still considered in the context of the K1 sources or eventually K2 sources. I'll address Vallejo's contention with respect to notice that had with the application. Vallejo relies on mixed media cases which are entirely inapplicable. Those cases involve... When you say application, you mean the application for a scope? Sorry, the separate rate application. They're saying the information within the separate rate application was not publicly available and because that information was not publicly available, the determination cannot be a K1 source. But again, mixed media cases involve a situation where the language of the orders unequivocally provides that the merchandise is or is not subject to the orders and because it's a mixed media source and the merchandise is packaged together with a non-subject item, what the court has said is that if Commerce is going to interpret using K1 sources, the contrary to the literal terms of the orders, then those K1 sources need to be publicly available. But here, that's necessarily not the case. If we're getting to a K1 analysis, there has already been a determination that the orders themselves are in fact ambiguous. That's sort of the threshold inquiry to get there. And so that necessarily means that Vallejo or a party in Vallejo's position was aware of the interpretation of the orders, that their product could be subject to them. And so the notice concerns raised just are not applicable. Can I ask a kind of general doctrinal question? The notion of ambiguity has undergone some changes in the last half dozen years initially in the interpretation of a regulation. Does any of that change in how much work one does and how many kinds of sources of interpretive assistance one looks at to conclude in the end that there's no ambiguity have any bearing on the ambiguity cut off in the staging of this analysis? Your Honor, broadly speaking, I'm not sure. I don't think it does in the context of this case. Again, I think that's in part because Vallejo hasn't challenged Commerce's K2 analysis, which ultimately determined that its product was in scope. Am I answering your question? Well, one of the papers here, I think, indicated that ambiguity is a one can get to a conclusion of ambiguity pretty darn quickly in this context. That used to be the case pre-Kaiser and counterpart in Chevron world. There was a period when that was very, very prevalent. I guess my question is, and that's no longer the case, does that alteration of the meaning of the term ambiguous have any bearing on the use of the term in this context where there's a K0 inquiry and then a K1 inquiry and a K2 inquiry and apparently you're not allowed to peek ahead without resolving each one before you can get to the others? Again, I don't think that sort of analysis is present here in the context of Commerce's orders. I think the Court has reiterated that the threshold to find ambiguity is still, at K0 analysis, is still a low threshold. Again, I think that would Why should that be? Because in Vandewater and Saha Thai, which is a case from last year, what the Court said is that and what Commerce's regulation says is that these orders are written intentionally broadly and so because they're written in general terms, it's likely there may be ambiguities sort of inherently present and here I think that's certainly the case because the orders, again, just speak broadly to this term of designation, don't specifically say that the alloy must be a registered alloy by the Aluminum Association and so just because they speak in general terms I think that lends itself practically speaking to a determination that the orders are ambiguous. Can I just ask what this is on that little piece of the blue brief that questions the continuation of the original suspension and it seems quite clear that if there was a original suspension that was valid and not undone by the Intermediate Trade Court ruling, and I don't think this one was, then the regulation provides for a continuation. What was the authority for the initial, what was it, 2015 or something, October or October 2021? October 15, 2021. 2021 suspension. Yeah, it was that same regulation at subsection L3. I have it here and it  where if the Secretary issues a final scope ruling and then, so that's the context we're operating in, and then a couple of sentences later, it says where there has been no suspension of liquidation, the Secretary will instruct the Customs Service to suspend liquidation. So that's how we got the initial suspension. As Your Honor said, the Trade Court never did anything to vacate that initial suspension, and then under L1 that suspension continued when the scope inquiry was issued on remand. If the Court has no further questions, we ask that the Court affirm that the Judge must report. Good morning, Your Honors. May it please the Court, I'm John Herman, Counsel to the Aluminum Association and several of its individual members. I just wanted to make a very quick point on ambiguity, as we've spent a lot of time talking about that this morning. And what I would refer Your Honors to is the discussion at pages 13 to 16 of our brief, where we review the participation of Valeo before the International Trade Commission at the preliminary phase of the injury investigation conducted by the ITC. During that hearing that was conducted by the ITC, a Valeo representative testified at that hearing, talked explicitly about a clad brazing sheet, talked explicitly about proprietary core alloys that were used, and all of the discussion during that conference indicated that that product was within the scope identified by the Commerce Department. I would submit to you that Valeo's contention now that the scope language is unambiguous, conflicts directly with the testimony that they gave during the ITC hearing, where they had a fundamentally different interpretation of the same language. I think people can disagree on whether something is unambiguous, but if you have a single party that has two different fundamentally opposed interpretations of the same language, that satisfies the definition of ambiguity. Happy to answer any other questions that you might have. Thank you. Yes, please. Two minutes.  Your honors, I would like to just address the issue about the low threshold. The low threshold does not mean that the alternative interpretation can be unreasonable. That's because of the legal principle articulated in DuFarco, in which the court said that in order for merchandise to be included, it has to be either explicitly included by the scope or the scope must reasonably be interpreted or could reasonably be read to include the merchandise. And therefore, the low threshold really refers to when there are two competing interpretations, commerce does not have to compare the reasonableness of those two interpretations and decide which one is more reasonable or the other. As long as it's reasonable, that's the bar set for the first hurdle in the analysis, which is the K-0 plain meaning analysis. The next is I would like to just address draw an important distinction between the Tielschitz and K-1 materials. The Tielschitz contains the definition of 3-series alloy as designated by the Aluminum Association. And that definition is incorporated into the plain language of the scope. And this court held that the plain meaning of scope language must reflect industry usage. And also, other sources such as dictionaries, industry standards are used in determining the plain meaning of the plain language. And that is different from K-1 materials because K-1 materials, on the other hand, are interpretive sources outside the plain language. They're different from what was ultimately adopted by the court. And therefore, when those two conflict, it's the plain meaning that governs the K-1 sources which are outside the plain language. Thank you, Your Honor. Okay, thank you. Thanks to all counsel. Case is submitted.